Salter *v.* Ely.

Catharine Ann Salter

*v.*

Stephen D. Ely and Joseph Addison Ely.

[Filed February 1st, 1898.]

1. The mere fact that a favored legatee and devisee denounces those who are discriminated against to a testator who is well in body and strong in mind, and surrounded by friends, and within reach of the protection of those who are denounced, is not sufficient to create a presumption against the instrument.

2. A party alleging undue influence in the execution of a will must prove it either directly, or by proving such circumstances as will warrant a presumption against it.

On appeal from a decree of the Monmouth county orphans court, which admits to probate paper-writings purporting to constitute the last will and testament of Joseph J. Ely, deceased.

*Mr. Robert Adrain* and *Mr. Clarence Linn,* for the appellant.

*Mr. Woodbridge Strong* and *Mr. John J. Ely,* for the respondents.

The Ordinary.

The disputed paper-writings consist of a will, dated and executed on the 10th day of November, 1893, and a codicil thereto, dated and executed on the 15th day of August, 1895. Both instruments are in the handwriting of Joseph J. Ely. The will contains eight paragraphs, in addition to an attestation clause which exhibits compliance with all statutory requirements in the

execution of a will.   The will provides that the debts and funeral expenses of Mr. Ely shall be paid; that his body shall be buried beside the grave of his first wife; that a plain monument shall be placed at the grave; that five grandsons, named, shall each have $100, and that two granddaughters and a daughter-in-law, named, shall have certain furniture, silverware and china, divided among them as the will designates; that a safe, a surveyor's compass and $2,000 are bequeathed to Joseph Addison Ely, a son of the testator; that the testator's library is bequeathed to the same son and the children of that son; that a wood-lot of four acres is devised to the testator's son Stephen; that a house and lot in Hightstown is devised to the testator's daughter Catharine; that two houses and two lots in Hightstown are devised to the testator's daughter Matilda, and that another wood-lot is devised to the testator's son Addison; that there shall be no charge for gifts theretofore made or thereafter to be made by the testator to his children; that the testator devises and bequeaths the residue of his estate to his two sons, Stephen and Addison, and appoints those sons the executors of the will, authorizing them to sell land not specifically devised, and to employ counsel to advise them, and gives them three years for the performance of their duties.   The will also revokes all former wills.

The codicil, a shorter instrument, ratifies and confirms the will, except so far as it changes it, and then proceeds to take from the son Stephen the wood-lot which was devised by the will to him, and gives it to the son Addison, and to give the testator's library exclusively to his son Addison, and to bequeath to the same son some surveyor's field-books and two writing desks, and to bid him to take good care of the testator's law dockets.

The validity of the will and codicil is assailed upon the insistence that Mr. Ely lacked capacity to make them and that they were the product of undue influence exerted over him.

Mr. Ely was a lawyer and surveyor who found occupation in those pursuits, for the greater part of his life, in the counties of Mercer and Monmouth sufficiently remunerative to enable him, with frugal habits, to make considerable gifts to his children and

Salter *v.* Ely.

leave at his death, which occurred on the 13th of September, 1895, at the age of eighty-two years, an estate valued at about $30,000. He was an eccentric man, possessed of much more than ordinary ability. He was high-tempered, easily provoked and bitter and vindictive towards those who offended him. His first wife, the mother of his four children, died in 1872. After her death, to economize, he took up his residence with his son Stephen, with whom and his son Addison he continued to live for twenty-three years, until his death in 1895, with the exception of a few months in 1886, during the life of his second wife, who survived their marriage a short time, with whom he lived those months at her house in Hightstown. His son Stephen lived in Hightstown until after 1880. His daughter Catharine married a man named Salter and lived in Hudson county. His daughter Matilda married a man named Perrine and lived in Mercer county, some eight or nine miles from Hightstown, and his son Addison lived on a farm in Monmouth county, four or five miles from Hightstown.

In February, 1880, Mr. Ely fell at a railway station and cut his head, upon which ensued blood-poison, which subjected him to a long, dangerous and painful illness at the house of Stephen, at Hightstown, from the effects of which illness he never completely recovered.

While it is shown that Mr. Ely was physically feeble after his illness in 1880, and that at times thereafter he exhibited a mental lassitude, it clearly appears that he possessed more than ordinary intelligence and abundant testamentary capacity when he executed both the will and the codicil. It is not shown that he was ever without testamentary capacity. As has been stated, both the will and the codicil are in his handwriting, and, as appears by inspection of those instruments, the former is long and to some extent complicated. Its contents evince that the draughtsman had a knowledge of Mr. Ely's property, and the natural objects of his bounty, and also a consideration of those who immediately surrounded him and daily ministered to his comfort, of his burial, of gifts he had made and might make to his children, and the appointment of executors and their

equipment for the performance of their duty. By the codicil, prepared two years later, the draughtsman evinces that he had a thorough knowledge of the provisions of the will, which, after trivial alteration, were ratified and confirmed as constituting a maturely-considered testamentary act.

Competency is not only shown by the instruments themselves, but also in the circumstances which attended their execution and preservation.

When the will was executed Mr. Ely resided with his son Addison, some nine miles from the county court-house, yet he took the precaution and trouble to drive to the court-house and there see the surrogate, whom he had known for twenty-five years, at that gentleman's office, and request him to be one of the witnesses to the will, and then to consult with the surrogate as to the other witness to the will, stating that if there were any of his old friends about, who would act as such witness, he would like to secure the service of one of them, and, at the suggestion of the surrogate, to go alone to the county clerk's office and see Holmes Murphy, the deputy county clerk, whom he had known for thirty years, and request him to be the other witness, then to return to the surrogate's office and bring the surrogate to the county clerk's office, where the will was executed. At Mr. Murphy's suggestion, because of Murphy's advanced years, he asked Mr. White, a younger man there, to act also as one of the witnesses. These three gentlemen so narrate the circumstances attending the execution of the will as to satisfy me beyond all doubt that Mr. Ely fully realized and comprehended the business in which he was engaged. Their testimony shows that he intelligently directed every detail in the proceeding.

This was on the 10th of November, 1893.

When Mr. Ely left the county clerk's office he took the will with him, and apparently retained it till the 12th of the next month, when he drove to the Allentown bank, in which he had a deposit, and delivered it in an envelope to the cashier, at the suggestion of the cashier writing upon the envelope his instructions as to its disposition. He took the precaution then to take from the cashier a receipt for it. Previously he had made a

copy of it with his own hand, which was found in his safe, at his son Addison's, after his death.

The codicil was executed about a month before Mr. Ely died, at the house of Addison, in the presence of the physician in attendance upon Mr. Ely and a neighboring farmer, for whom the testator sent to act as a witness. He had not previously communicated with the farmer, but two days before the execution of the codicil he told his physician that he wished to execute a codicil to his will, and he would like the physician to be a witness to it. When the codicil was executed he was feeble physically, but clear in his mind. He sat at a small table which the farmer, Mr. Jobes, placed before him, and directed every step in the proceeding in strict conformity with the statute's requirements. He explained to the witnesses that the paper he produced was called a codicil to his will ; that it made a change in the will, and that he would like to have the fact of his executing it kept quiet. It appears that he put this instrument in his safe, where it was found after his death with the copy of the will. The testimony of the subscribing witnesses to the codicil satisfies me that the testator was fully competent to make that instrument.

Passing to the second ground of contest—the contention that the will and codicil were the product of undue influence.

The position of the contestants is, that such influence was exerted over Mr. Ely by his son Stephen. It is almost needless to say that undue influence is the destruction of free agency. It is that which constrains a person to do what is against his will, and what he would not do if left to himself, no matter by what means the control is exercised. There is no direct proof that Stephen procured or was instrumental in making either the will or the codicil. As I understand the contestants, their contention is that Stephen entertained a vindictive hatred of his sisters ; that he had repeatedly declared that they should not participate in his father's estate, and that through his high temper and violence towards his father, he so dominated the father as to induce the making of a will which practically disinherits the daughters, it appearing that the property devised to

them is scarcely five per cent. of the value of that which was bequeathed and devised to the sons.

Apparently the will is an inofficious instrument, but the proofs do not disclose that Stephen intermeddled in any way with the preparation of it. At best they show that he visited his father more or less frequently during the latter years of his father's life, and that occasionally the high and somewhat intemperate tones in the voices of the father and son would indicate that they were quarreling. It shows, also, that he and his father would drive about the country together, while the father was able to do so, and that Stephen was cognizant of investments offered to his father and made by him; but at the same time it discloses that in the last year or two of the old man's life, as he became more feeble physically, and. less able to go about, Stephen's visits became so infrequent that at one time months elapsed between them, and the father sent for him. When it is remembered that the testator lived at his son Addison's house, and had lived there from 1881 till he died, in 1895, and that the brothers, Stephen and Addison, had quarreled and had not spoken to each other for many years, it is not perceived that much opportunity offered for the exertion of a continuous coercion on Stephen's part which could induce the making of two instruments, twenty-one months apart, both of which adhered to the same testamentary purpose.

It can scarcely be doubted that Stephen was selfish, jealous, parsimonious, high-tempered and viciously vindictive, partaking, to some extent, of the mental characteristics of his father, and that it was habitual with him to inveigh with bitterness against his sisters, not only to his father, but to others also, and that although he was the recipient of frequent gifts from his father, he was jealously disturbed when like gifts were made to his sisters, and would tell his father that they had had enough; that they had husbands and did not need more. I am impressed that the father understood and pitied his son's weakness, but I fail to find that he feared him.

It is shown that Mr. Ely and Stephen were, at times, the best of friends, and that at other times they would quarrel and keep aloof from each other. Mrs. Salter testifies that her father told

her that Stephen was high-strung and unevenly balanced, and could not avoid the violent conduct of which she complained.

During Mr. Ely's illness in 1880, Mrs. Salter and Stephen were assiduous in their attentions to him, at the same time each resented the presence of the other, regarding each other with suspicion and distrust.   As the father convalesced, their strained relations culminated in Stephen's ejection of his.sister and a nurse from his house.   Later in that illness, Stephen quarreled with his father and left the house himself, and Mrs. Salter returned to it.   It is quite evident, from the letters of the father to his daughter immediately thereafter, that she had won his confidence and gratitude, and that Stephen was under his condemnation. The proofs make it evident that for two or more years after that time there was an estrangement between Mr. Ely and Stephen, during which Stephen exhibited a vicious vindictiveness against his father, and it appears that during this time Mr. Ely made a will which, he declared to the attesting witnesses, left Stephen "very little."   But the proofs show, also, that after 1883 the father and Stephen became reconciled, and that thereafter their intimacy and friendship varied as has been stated.

There is some evidence that once, about the time of the execution of the will, Stephen drove with his father to Freehold, but that evidence is entirely too vague to justify more than a suspicion that it was on the day the will was executed.   One witness says that he saw someone apparently attend Mr. Ely to the door of the surrogate's office; but he does not identify that person, nor is he able to say that the person was in fact in attendance upon Mr. Ely.   There is not a particle of evidence to show that in the time intervening between the execution of the will and the deposit of it by Mr. Ely in the Allentown bank Stephen even saw his father, or that Mr. Ely was not entirely free to destroy the will if he had wished to do so. When he went to the Allentown bank he drove with a young grandson and intelligently and in apparent freedom from all restraint, deposited the will there.

A fact that militates against the theory that the will was Stephen's production is, that although when the will was made

Stephen was quarreling with his brother Addison, and had not spoken to him for years, it gives to Addison and his family the largest share of the father's estate and associates the brothers in the executorship. It does not appear to be probable that Stephen would coerce such provisions.

I do not deem that because the will is inofficious a duty is imposed upon the court to find a reason for the inofficiousness before it can declare in favor of the will. Nor is that duty cast on those who are to take under the will if they did not partake in its production. A man may dispose of his property as he pleases. He may do injustice if he has testamentary capacity and acts freely. *Smith* v. *Smith, 3 Dick. Ch. Rep. 566, 590.* However, it is insisted that the proofs will warrant the inference that prior to the making of the will Mr. Ely presented $8,000 to each of his daughters, which in the will he protected from the rapacity of Stephen by provision that no charges should be made for past or future gifts to his children, and will justify the belief that the daughters may have been discriminated against because of their opposition to his second marriage and their participation in the circulation of, or belief in, stories derogatory to his moral character. I do not mean to say that either of these explanations has been proved to my satisfaction. They serve to illustrate that reasons may have existed, independently of unlawful influence, to induce the testator to make the disposition of his property he made.

Another possible reason is presented, when it is considered that for more than twenty years Mr. Ely lived with one or the other of his sons free of expense with the avowed object of an economy in his expenditures, which enabled him to accumulate at least a large part of that which the will gives to them.

Much importance has been attached to the failure of the proponents to examine Stephen as a witness in the case. I do not think that such failure can be fatal to this will. The *indicia* of undue influence in this case are not strong enough to shift the burden of proof. The mere fact that a favored legatee and devisee denounces those who are discriminated against, to a testator who is well in body and strong in mind and surrounded

by friends, and within reach of the protection of those who are
denounced, is not sufficient to create a presumption against the
instrument. *Dumont* v. *Dumont, 1 Dick. Ch. Rep. 235.* The
party alleging undue influence must prove it, either directly or
by proving such circumstances as will warrant a presumption
of it. *Id. 230.*

Here, not only has the proof failed to show such circum-
stances, but, on the contrary, by the testimony of five subscribing
witnesses and a bank cashier it has pointed to an intelligent,
competent and self-controlled testator.

I will affirm the decree appealed from.